**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _6/1/2018_

Lopez,

                              Plaintiffs,

            -against-

United States Of America et al.,

                              Defendants.

1:16-cv-07094 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, United States Magistrate Judge:**

Plaintiff, Astrid Lopez ("Plaintiff" or "Lopez"), filed suit against defendant, United States of America (the "United States" or "Defendant"), pursuant to the Federal Torts Claim Act (the "FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, for alleged injuries she suffered in an automobile accident on September 13, 2013. Lopez alleges that Oliver Jones III ("Jones"), a now-retired employee of the United States who was driving a van, collided with her vehicle and that Jones was negligent in his operation of the van, causing the accident and her injuries. In turn, Defendant alleges that Lopez's own actions caused the accident and that, in any event, her injuries are not serious.

The parties consented to the jurisdiction of a United States Magistrate Judge, pursuant to 28 U.S.C. § 636, and the Court conducted a bench trial from May 29, 2018 through May 31, 2018. Having considered all of the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52. For the reasons set forth below, the Court finds that Lopez has not proven that she suffered a "serious injury" under the governing provisions of the New York

Insurance Law. Nor has she proven economic loss or damages. Thus, judgment shall be entered in favor of the United States.

## FINDINGS OF FACT

### I.     The Accident[1]

On September 13, 2013, Plaintiff's car and Jones's van collided in the intersection of 11th Avenue and West 41st Street in Manhattan, New York. (JPTO,[2] ECF No. 68, at 5.) At the time of the September 13, 2013 motor vehicle accident, Jones was operating the van in the course of his employment by the United States. (*Id*.) Plaintiff contends that Jones entered the intersection against a red traffic signal, and Jones contends that Plaintiff entered the intersection against a red traffic signal while using her cellphone. (*Id.*, at 2-3.) After the accident occurred, an ambulance arrived at the intersection, but Plaintiff refused medical attention. (Tr. at 44.[3]) Immediately following the accident, Plaintiff did not feel any pain and was able to walk away. (Tr. at 83-84; Ex. 6 at KO 2.[4])

### II.    Plaintiff's Medical Condition

#### A.     Plaintiff's Medical Treatment

Plaintiff first sought medical treatment based on the accident when she went to Clara Maass Hospital, approximately 48 hours after the accident. (Tr. at 85; Ex. 4 at CM 6; Ex. 6 at KO

---

[1] Because the Court is not resting its decision on whether Lopez or whether Jones was the cause of the accident, the factual findings with respect to the accident itself are sparse. The factual findings principally focus on the issue of whether or not Lopez suffered a "serious injury" and the issue of Plaintiff's employment.

[2] The parties filed a Joint Pretrial Order (hereinafter referred to as the "JPTO") on May 24, 2018.

[3] Citations to the trial transcript are made using the following citation form: "Tr. at __."

[4] Citations to the exhibits admitted into evidence at trial are made using the following citation form: "Ex. __."

2.) When Plaintiff was evaluated at Clara Maass Hospital on September 15, 2013, she complained of "left-sided body pain from neck down to left flank area." (Ex. 4 at CM 14.) On examination, the doctor found that she had full range of motion in her neck, with pain, and that her back was tender. (*Id*. at CM 15.) X-rays were taken of Plaintiff's spine, which were normal. (*Id*. at CM 40.) The doctor prescribed her Naprosyn, Percocet and Flexeril.[5] (Ex. 4 at CM 15-16.) Plaintiff was also given an injection of Toradol.[6] (Ex. 4 at CM 38.) At Clara Maass Hospital, Plaintiff was given the following diagnoses: "motor vehicle crash – minor"; "cervical strain"; "MVA [motor vehicle accident] restrained driver"; and "muscle strain." (Ex. 4 at CM 44.) Plaintiff was released from Clara Maass Hospital about three hours after she arrived. (Tr. at 86.)

After visiting Clara Maass Hospital on September 15, 2013, Plaintiff did not seek medical treatment for any injuries allegedly suffered as a result of the accident until October 18, 2013.[7] (Tr. at 87; Ex. 5 at PZ 139.) On that day, Plaintiff sought treatment for her alleged injuries from chiropractor Dr. Peter Ponzini, whom Plaintiff saw because she was sent to him by her previous lawyer. (Tr. at 89.) Dr. Ponzini provided physical therapy to Plaintiff and also referred her to other doctors who she started seeing in November 2013, about two months after the accident. (*Id*. at 87, 89.) Allstate Insurance Company paid these doctors' bills. (*Id*. at 89.)

The medical records of the various doctors to whom Dr. Ponzini referred Plaintiff are sometimes inconsistent with one another, and appear to contain certain assessments that are

---

[5] Naprosyn is an anti-inflammatory drug; Percocet is a painkiller; and Flexeril is a muscle relaxant medication. *Dorland's Illustrated Medical Dictionary* 455, 717, 1232, 1356, 1409 (32nd ed. 2012) (hereinafter, "*Dorland's*").

[6] Toradol is an anti-inflammatory pain medication. *Dorland's* 984, 1940.

[7] The doctors at Clara Maass told Plaintiff she should follow up at the Newark Community Health Care Center in one or two days, but she did not do so. (Tr. at 86.)

unsupported. Nevertheless, the Court sets forth below a summary of the medical records because, even if they all are taken at face value, none of them individually or collectively supports a finding that Plaintiff suffered a serious injury:

On November 4, 2013, Plaintiff was examined by an orthopedist, Dr. Robert Kayal. Dr. Kayal found that Plaintiff had limited range of motion in her neck and lower back. (Ex. 6 at KO 4.) He assessed Plaintiff as having a "bulging cervical disc" and "bulging lumbar disc." (*Id*. at KO 5.) However, at the time of this assessment, Plaintiff had not yet received magnetic resonance imaging ("MRI") testing. When MRIs were taken of Plaintiff's cervical and lumbar spine on November 14, 2013, the results of both were normal, with no disc herniation. (Ex. 6 at KO 32-33.)

On December 2, 2013, Plaintiff was examined by Dr. Michael Binder, an anesthesiologist and interventional pain management specialist. Dr. Binder found that Plaintiff's range of motion in her cervical spine was decreased to a moderate degree. He also found that Plaintiff's range of motion in her lumbar spine was diminished by at least 25%. (Ex. 7 at RP 18-19.) Dr. Binder diagnosed Plaintiff with cervical strain/sprain; bilateral cervical facet syndrome; right temporomandibular joint posttraumatic distortion; lumbar sprain/strain; bilateral lumbar facet syndrome; and right posttraumatic sacroiliitis. He recommended that she continue conservative treatment with Dr. Ponzini, and instructed Plaintiff to follow up in five weeks. (Ex. 7 at RP 19-20.)

On December 3, 2013, Plaintiff was examined by Dr. Sammy Masri, a physician who specializes in sports medicine. Dr. Masri found that Plaintiff had a normal range of motion in her cervical spine in all planes. He did not record any limitations in the range of motion in Plaintiff's lumbar spine. In his treatment plan, he noted that Plaintiff was to continue her chiropractic sessions with Dr. Ponzini. (Ex. 5 at PZ 26-27.)

On December 4, 2013, Plaintiff again was examined by Dr. Kayal. Dr. Kayal noted that Plaintiff's condition was improving with physical therapy. (Ex. 6 at KO 7.) Although he did not note any abnormal findings from Plaintiff's MRIs, his medical notes continued to state that his assessment was that Plaintiff had a "bulging cervical disc" and "bulging lumbar disc." (*Id*. at KO 10.) Dr. Kayal gave Plaintiff two injections of pain medication and prescribed physical therapy. (*Id*.)

On January 20, 2014, Plaintiff was examined by Dr. Binder. Dr. Binder found that Plaintiff's range of motion in her cervical spine was still moderately decreased. He also found that Plaintiff's range of motion in her lumbar spine "is still decreased by at least 20% to 25%," and he recommended that medial branch nerve blocks be done. (Ex. 7 at RP 14-15.) On February 3, 2014, Plaintiff was examined by Dr. Kayal. Dr. Kayal noted that Plaintiff had been doing better after receiving injections and physical therapy. He noted some limitation in the range of motion in Plaintiff's neck and back. (Ex. 6 at KO 12-14.)

Dr. Binder performed lumbar medial branch nerve blocks on Plaintiff on February 21, 2014. (Ex. 9 at ES 13.) On February 26, 2014, while noting that Plaintiff continued to improve slowly, Dr. Kayal gave Plaintiff additional injections of pain medication and recommended that Plaintiff continue physical therapy. (Ex. 6 at KO 17-21.) Dr. Binder performed cervical diagnostic medial branch nerve blocks on Plaintiff on February 28, 2014. (Ex. 9 at ES 9.)

On March 5, 2014, Plaintiff's physical therapist assessed limitations in her range of motion in her cervical and lumbar spines of fifteen degrees or less. (Ex. 5 at PZ 147.) Plaintiff was examined by Dr. Binder on March 13, 2014, at which time he noted that Plaintiff's range of motion had increased. (Ex. 7 at RP 12.) On March 26, 2014, Dr. Kayal noted that Plaintiff was

"improving with the therapy and epidural injections." (Ex. 6 at KO 22.) He recommended that Plaintiff continue with physical therapy and follow up in six weeks. (*Id.* at KO 26.)

Plaintiff underwent additional diagnostic medial branch blocks in her lumbar and cervical spines on March 25, 2014 and April 15, 2014. (Ex. 7 at RP 7.) When she visited Dr. Binder on April 28, 2014, he noted that Plaintiff was "very pleased with both diagnostic treatments." (*Id.*) He further noted that, "[i]n the neck area, Ms. Lopez reported pain dropped by at least 70%-80%" and that, "[i]n the lower back, Ms. Lopez reported pain dropped by at least 80% after the second diagnostic medial branch blocks." (*Id.*) Dr. Binder diagnosed Plaintiff with right cervical posttraumatic facet syndrome and bilateral lumbar posttraumatic facet syndrome. (Ex. 7 at RP 8.)

On or about May 19, 2014, an evaluation of Plaintiff by a physical therapist showed no more than five to ten degrees reduction in her range of motion in her cervical or lumbar spines. (Ex. 5 at PZ 76.) On May 20, 2014, Dr. Binder performed a right cervical medial branch radiofrequency ablation on Plaintiff. (Ex. 7 at RP 27.) Dr. Binder performed lumbar endoscopic rhizotomies[8] on Plaintiff on June 4 and 17, 2014. (*Id*. at RP 23, 25.) On July 11, 2014, Dr. Binder found that, after the rhizotomies conducted in June 2014 in Plaintiff's lumbar spine, Plaintiff had almost full range of motion in her lumbar spine, and on Plaintiff's own report, she stated her lower back pain was reduced to zero. (*Id*. at RP 5.)

On July 14, 2014, Dr. Kayal reported that, after undergoing her procedure with Dr. Binder, Plaintiff had "started therapy and feels better already." (Ex. 6 at KO 28.) He recommended that

---

[8] According to Plaintiff's medical expert, a "rhizotomy" is a process by which a nerve is destroyed or denatured. (Tr. at 141.)

Plaintiff continue with physical therapy and follow up in six weeks. (*Id*. at KO 31.) On July 30, 2014, Plaintiff's physical therapist noted limitations of thirteen to thirty degrees below normal in the range of motion in Plaintiff's lumbar spine. (Ex. 5 at PZ 55.) On September 4, 2014, Plaintiff's physical therapist noted limitations of only two to six degrees below normal in the range of motion in Plaintiff's lumbar spine. (*Id*. at PZ 38.)

On September 25, 2014, Dr. Binder noted that after her multiple treatments, including rhizotomies and medial branch nerve blocks and ablations, Plaintiff experienced "no pain in her neck area and she experienced minimal pain in her lower back area." (Ex. 7 at RP 3.) Plaintiff had almost full range of motion in both her cervical and lumbar spines. (*Id*.) Dr. Binder noted in his medical record that the conditions with which he had previously diagnosed Plaintiff—right cervical posttraumatic facet syndrome and bilateral lumbar posttraumatic facet syndrome—were "resolved." (*Id*.)

On January 14, 2015, Dr. Binder noted that Plaintiff felt "excellent" after undergoing bilateral lumbar endoscopic rhizotomies and that her level of pain was 1 out of 10 "at its worst." (Ex. 7 at RP 1.) Plaintiff's physical examination findings showed almost full range of motion in both her cervical and lumbar spines, no pain on palpitation, no tenderness in her cervical spine and minimal sensitivity in her lumbar spine. (*Id*.) Dr. Binder noted in his medical record that Plaintiff "does not need any more additional physical therapy at this time and she does not need any more interventional pain management treatment at this time." (*Id*. at RP 2.) He therefore discharged Plaintiff from his service. (*Id*.)

Plaintiff went to Clara Maass Medical Center three times between August 2015 and November 2015 complaining of lower back pain. During Plaintiff's visit on the night of August 24,

2015, the treating doctor noted some tenderness in Plaintiff's lumbar spine and pain on palpitation of Plaintiff's right hip, but no tenderness or stiffness in Plaintiff's neck. On re-evaluation shortly after receiving medication, Plaintiff experienced improvement in her symptoms. (Ex. 4 at CM 62-63.) The treating doctor assessed Plaintiff as having "back pain, lumbosacral strain," and discharged her with prescriptions for pain and muscle relaxant medication. (*Id*. at CM 63.) During Plaintiff's visit on September 24, 2015, the treating doctor noted tenderness in Plaintiff's lumbar spine and mild spasm, but no tenderness or stiffness in Plaintiff's neck. Plaintiff was diagnosed with back pain, and treated with pain, anti-inflammatory and muscle relaxant medication. (*Id*. at CM 119, 148.) On re-evaluation, she noted "good pain relief." (*Id*. at CM 119.) The hospital ordered an x-ray, the results of which were normal. (*Id*. at CM 144.) During Plaintiff's visit on the night of November 2, 2015, the treating doctor noted tenderness in Plaintiff's lumbar spine and mild spasm, but no tenderness or stiffness in Plaintiff's neck. Plaintiff was diagnosed with back pain, and treated with pain and muscle relaxant medication. (*Id*. at CM 171-72.) On re-evaluation during that visit, Plaintiff's symptoms had improved. (*Id*. at CM 172.)

Aside from one visit to Saint Michael's Medical Center on July 24, 2016, during which Plaintiff complained of pain in her buttocks, Plaintiff did not seek any medical care between November 2015 and August 2017. (Tr. at 123, 126; Ex. 11 at SM 11.) On August 30, 2017, Plaintiff returned to Dr. Binder for the first time since he had discharged her in January 2015. This was done about a month after Plaintiff's deposition in this case. (Tr. at 94-95.) Dr. Binder noted that Plaintiff presently was working at a job that required her to sit in the car and in the office, and that she reported a return of low back pain, but no neck pain, numbness, tingling or muscle

weakness. (Ex. 7 at RP 38.) Plaintiff had full range of motion in her cervical and lumbar spines, no signs or symptoms of radiculopathy, and no signs of facet pain, but pain in her sacroiliac joints; Dr. Binder recommended that Plaintiff restart physical therapy and return in two months. (*Id*. at RP 38-39.)

Dr. Binder examined Plaintiff again on November 2, 2017, and found that she had full range of motion and no signs or symptoms of cervical radiculopathy or cervical posttraumatic facet syndrome, but that she also had pain in her lumbar spine with extension and pain in her sacroiliac joints. (Ex. 7 at RP 40-41.) Dr. Binder examined Plaintiff on January 10, 2018, after performing a diagnostic sacroiliac joint injection on Plaintiff. Dr. Binder diagnosed Plaintiff with "resolved" cervical posttraumatic facet syndrome; "resolved" bilateral lumbar posttraumatic facet syndrome; status post bilateral lumber endoscopic rhizotomy; and continued posttraumatic bilateral sacroiliitis, for which he prescribed physical therapy. (*Id*. at RP 46-47.)

Dr. Steven Aydin, who was called as a medical expert by Plaintiff at trial, began treating her in January 2018, as discussed below.

B.     **Plaintiff's Medical Expert Records and Testimony**[9]

Dr. Aydin is a doctor of osteopathy and is board certified in pain management. (Tr. at 131-32.) He began treating Plaintiff in January 2018 when she contacted the office where Dr. Kayal worked.[10] In February 2018, Dr. Aydin ordered MRIs of Plaintiff's cervical and lumbar spines, to be completed by a firm named Kayal MRI. The results of these MRIs were normal. (Ex. 6 at K 55, K 72; Tr. at 168-69.) On cross-examination, he noted that MRIs done of Plaintiff's cervical and

---

[9] Dr. Aydin is a hybrid fact/expert witness since he both treated Plaintiff and is offering his expert opinion.

[10] Dr. Aydin had joined Dr. Kayal's group, the Kayal Orthopedic Center, in 2017. (Tr. at 135-36; Ex. 6 at K 1.)

lumbar spines in November 2013 also were normal and showed no evidence of disc bulges. (Tr. at 159-60.)

Dr. Aydin explained that, in his specialty of pain management, he relies on subjective complaints of pain by a patient, even if there are no objective signs of how such pain was caused. (Tr. at 139-40 (". . . I'm trying to assess someone's objective pain by subjective complaints, so as I mentioned, I take a picture of the facet,[11] look at it, see the anatomy, but sometimes, if there's not overt arthritis or some sort of direct trauma to the area, I won't see any change".).) He further explained that he takes his patient's pain complaints at face value, such that he cannot be sure whether Plaintiff is faking her pain. (*Id*. at 175 ("Any of my patients who tell me they have issues or pain, my goal is to treat their complaints as objectively as I can . . ..").)

Dr. Aydin's expert opinion is that Plaintiff suffers from "facet pain syndrome," which he explained as follows: "Often, unfortunately, whenever you hear the words 'facet pain syndrome' or anything that has the word 'syndrome' in it in medicine, it usually means that we can't find something diagnostic that has either objectively assessed it or a reason for why it's happening." (Tr. at 156.)[12] In addition, he diagnosed Plaintiff with cervical and lumbar muscle strain (Tr. at 167), which – as discussed below – is the same diagnosis as Defendant's medical expert, Dr. Roth.

Significantly, Dr. Aydin characterized Plaintiff's injury as moderate, not severe. (Tr. at 176.) The following questions and answers on cross-examination elaborate on this point:

---

[11] According to Dr. Aydin, "facets" are a system of joints in a person's back that stabilize the spine and allow movement. (*See* Tr. at 137.)

[12] On cross-examination, Dr. Aydin admitted that facet pain syndrome usually resolves within six to twenty-four months, and usually resolves with a combination of conservative treatment and interventional pain management. (Tr. at 174-75.)

Q. In your opinion, Ms. Lopez can fully engage in most activities, though her pain may prove a limitation?

A. Correct.

Q. Ms. Lopez can climb stairs?

A. Yes.

Q. She can walk?

A. Yes.

Q. She can drive?

A. Most likely, yes.

Q. She can run daily errands?

A. Yes.

Q. It's also your opinion that Ms. Lopez can work, correct?

A. Correct.

(Tr. at 175-76.)

C.     **Defendant's Medical Expert Testimony**

Dr. Neil Roth testified on behalf of the United States to offer expert testimony in the field of orthopedics. (Tr. at 210, 215.) To prepare for his testimony, he examined Plaintiff for one hour. (*Id*. at 215, 217, 278.) His examination was very thorough, and included (among other things) a general inspection of Plaintiff, an assessment of her gait and her ability to maneuver on and off the examination table, as well as reflex testing and maneuvers. (*Id*. at 219-27.) Dr. Roth also reviewed medical records and the deposition testimony of Plaintiff and Dr. Aydin. (*Id*. at 215-16.) Dr. Roth gave his expert opinion, which the Court credits, that Plaintiff "at most sustained a cervical muscle strain which was resolved, as well as a lumbar muscle strain which was also

resolved." (*Id*. at 216.) He further opined that she has no limitations in her ability to work either now or in the future. (*Id*. at 217.)

Dr. Roth testified that, based upon his review of the medical records, there was no objective evidence of injury suffered by Plaintiff as a result of the accident. (Tr. at 232.) Dr. Roth further testified that the way to assess whether someone has a bulging disc, which Dr. Kayal had diagnosed in Plaintiff, is by use of an MRI, and that the MRIs done on Plaintiff were normal and did not show a bulging disc. (*Id*. at 235-37.)

## III.    Plaintiff's Post-Accident Employment

### A.    Jobs Held By Plaintiff After Accident

After the September 2013 accident, Plaintiff continued to work as a nanny for Sherri Shepherd for nearly two years. (Tr. at 50-54, 63; Ex. B.) In fact, Plaintiff admitted at trial that she did not miss any time working for Ms. Shepherd after the accident. (Tr. at 87.) Plaintiff stopped working for Sherri Shepherd in July 2015 because Ms. Shepherd moved to Los Angeles and not because of any difficulty performing her work as a result of any alleged injury. (*See* Tr. at 54-55.)

Plaintiff collected unemployment benefits during the period between the end of her job with Sherri Shepherd and the beginning of her next job at Unclaimed Freight, a furniture store in Clifton, New Jersey. (Tr. at 105-06.) Plaintiff worked as a sales associate at Unclaimed Freight from March 22, 2016 through August 5, 2016. Plaintiff was terminated by Unclaimed Freight for "excessive absenteeism" after missing eight days of work without calling in her absences. (Tr. at 63-67; Ex. A at UF 13-14, 19-21, 30-31.)

B.    **Defendant's Vocational Expert Testimony**

Defendant put forth a vocational expert, Dr. Kincaid, to offer testimony about Plaintiff's ability to work. Notably, Dr. Kincaid's testimony was grounded on two separate scenarios – one, that the expert opinions of Dr. Aydin were valid, and two, that the expert opinions of Dr. Roth were valid. Dr. Kincaid's opinion was that Plaintiff, after the accident, was employable under either scenario, and that Plaintiff was placeable in her local labor market under either scenario. (Tr. at 318-19.) The Court credits this testimony, not only based upon its observation of the witness testimony, but also based upon the fact that Plaintiff was employed after the accident in at least two jobs, as discussed above.

## CONCLUSIONS OF LAW

I.    **Legal Standards**

Under the FTCA, the United States is liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Because the accident in question occurred in Manhattan, New York, the laws of New York State and New York City govern the issues of liability and damages in this action. *See*, *e.g.*, *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988); *Holland v. United States*, 918 F. Supp. 87, 89 (S.D.N.Y. 1996). To establish that a defendant acted negligently under New York law, the plaintiff must establish three elements by a preponderance of the evidence: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom."

*Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985); *see Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 177 (2d Cir. 2013). Under New York law, the burden is on the plaintiff to prove, by a preponderance of the evidence, that she is entitled to a damages award. *Craig Test Boring Co., Inc. v. Saudi Arabian Airlines Corp.*, 138 F. Supp. 2d 553, 557 (S.D.N.Y. 2001).

Under New York's so-called "no-fault" automobile insurance law[13] there is "no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss." N.Y. Ins. L. § 5104(a). A "serious injury" is defined by statute as "a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; ***permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system***; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." *Id.* § 5102(d) (emphasis supplied).[14] "Basic economic loss" means up to $50,000 of certain categories of expenses, including necessary medical expenses and loss of earnings, combined. *Id.* § 5102(a).

The New York Court of Appeals has held that "to qualify as a serious injury within the meaning of the statute, 'permanent loss of use' must be total." *Oberly v. Bangs Ambulance Inc.*, 96 N.Y.2d 295, 298 (2001). Whether the limitation on the use of a body function is "permanent"

---

[13] New York's "no-fault" law was enacted in part to "weed out frivolous claims and limit recovery to significant injuries." *Dufel v. Green*, 84 N.Y.2d 795, 798 (1995).

[14] The emphasis above has been supplied since, as set forth below, these are the two types of "serious injury" that Plaintiff is asserting in this case.

or "significant" requires a determination of the qualitative nature of the injury in relation to the use of the body part. *Toure v. Avis Rent A Car Systems, Inc.*, 98 N.Y.2d 345, 353 (2002). A "minor, mild or slight limitation" does not qualify as a serious injury. *Licari v. Elliot*, 57 N.Y.2d 230, 236 (1982).

A plaintiff's mere subjective reports of pain, numbness or other symptoms are not sufficient to demonstrate "serious injury." *Toure*, 98 N.Y.2d at 350 ("[W]e have required objective proof of a plaintiff's injury in order to satisfy the statutory serious injury threshold; subjective complaints alone are not sufficient." (citations omitted)). Those medical diagnoses which rely on subjective reporting of symptoms "may fall short of the kind of objective medical evidence necessary to establish serious injury under New York law." *Williams v. United States*, 597 F. App'x 647, 649 (2d Cir. 2015) (finding in FTCA case arising out of motor vehicle accident that the only objective evidence of injury which did not rely on plaintiff's subjective reports were: (1) MRIs taken after accident, and (2) EMG nerve conduction study) (citing *Toure*, 98 N.Y.2d at 351)). Similarly, the plaintiff must submit medical reports detailing the injury based on objective medical determinations. *Toure*, 98 N.Y.2d at 353 (citation omitted).

"Objective medical evidence can include diagnostic tests (such as an EMG or MRI), or a numeric assessment of lost range of motion." *Madden v. Lee*, Case No. 01-CV-7856 (GWG), 2002 WL 31398951, at *4 (S.D.N.Y. Oct. 25, 2002) (internal citations omitted). New York courts have generally found that injuries such as bulging discs and tears in tendons and/or ligaments are not sufficient evidence to establish a serious injury when unaccompanied by "objective evidence of the extent of the alleged physical limitations resulting from the injury and its duration." *Little v. Looch*, 71 A.D.3d 837, 838 (2d Dep't 2010). The burden of proof is on the plaintiff to show she

has suffered a serious injury. *Krynski v. Chase*, No. 06-CV-4766, 2016 WL 1029498, at *4 (E.D.N.Y. Mar. 8, 2016), *aff'd*, 677 F. App'x 24 (2d Cir. 2017) (citing *Narumanchi v. Am. Home Assur. Co.*, 317 F. App'x 56, 58 (2d Cir. 2009)).

The Court has discretion to determine the credibility of the testimony of the plaintiff and any medical experts regarding the plaintiff's injury and diagnosis. *See Williams*, 597 F. App'x at 648-49.

## II.    Parties' Negligence

As noted by Plaintiff's counsel in his opening statement,[15] on the issue of which party was negligent, the Court is faced with a swearing contest. Both Lopez and Jones claim that the traffic signal they were facing was green when they proceeded into the intersection. In the case of Lopez, the Court had an opportunity to assess her credibility when she testified during the trial about how the accident occurred. In the case of Jones, the Court was faced with reading a cold deposition transcript, since Jones was not present in court to testify.

The Court noted two significant items that caused it to question Lopez's account of the events. On direct examination, she testified that the traffic signal was directly in front of her. (Tr. at 34 ("Q. Where was [the traffic signal] when you stopped? A. Right in front of me. Q. It's right in front of the middle lane? A. Yes.").) However, when the Court showed her a photo of the intersection (Ex. C at 2) and asked which traffic signal she was observing when stopped at the intersection, she referred the Court to a traffic signal on a post at the far right side of the intersection. (Tr. at 129-30.) Next, although Plaintiff denies being on her cell phone when the

---

[15] "Under liability, your Honor, this is one of the classic cases of he-said-she-said. I had the light; he had the light." (Tr. at 7.)

accident occurred, she testified on cross-examination that she had driven in the past while talking on her cell phone. (Tr. at 83 ("Q. Have you ever talked on your cell phone while driving? A. Of course.").) In addition, Plaintiff's cell phone records show many calls being made at around the time the accident occurred. (Ex. 3 at S 5.)

Jones's testimony, on the other hand, seems credible, with one exception. During his deposition, Jones testified that, before proceeding through the intersection, he stopped to double check the traffic signal. (11/3/17 Dep. Tr. at 28.) However, the report of accident that Jones filed on October 9, 2013, makes no mention of him stopping. (*See* Ex. 2 at 2.)

In these circumstances, the Court declines to rule on who was negligent, as between Plaintiff and Jones, since such ruling is not necessary to the outcome of this case. As discussed below, the record is quite clear that Plaintiff has not suffered a "serious injury," nor has she proven damages, and therefore she is not entitled to any recovery.

### III.     Plaintiff Did Not Suffer A "Serious Injury" In The Accident

Part of the Court's disposition of this case is based upon definition of "serious injury" that is contained in Section 5104(a) of the New York Insurance Law. The parties stipulated in the Joint Pretrial Order that Plaintiff did not suffer death, dismemberment, significant disfigurement, a fracture, loss of a fetus, or permanent loss of use of a body organ, member, function, or system as a result of the accident. (JPTO at 6, ¶ 12.) Thus, her injuries could be deemed "serious" only if they fall into one of the three remaining categories under Section 5104(a): (1) permanent consequential limitation of use of a body organ or member; (2) significant limitation of use of a body function or system; and/or (3) a medically determined injury or impairment of a nonpermanent nature which prevented Plaintiff from performing substantially all of the material

acts which constituted her usual and customary daily activities for no less than ninety days during the one hundred and eighty days immediately following the injury or impairment. At trial, Plaintiff's counsel asserted that Plaintiff only claims her injuries fall under categories (1) and (2), and not (3). (Tr. at 351.) Thus, the Court examines only those two remaining categories and finds that Plaintiff has not met her burden to show that any injury she may have sustained as a result of the accident was "serious" under either of the two categories.

A.    **Plaintiff's Lack Of Credibility**

As an initial matter, the Court finds that Plaintiff was not a credible witness. By way of example:

(1) Plaintiff testified that Dr. Binder's surgeries did not help her (Tr. at 58), but admitted that she told Dr. Binder after the surgeries that her pain had dropped to zero. (*Id*. at 91.)

(2) Plaintiff testified that she does not drive a car anymore because she is "too scared" and she "can't sit in an upright position to drive." (Tr. at 67), but she also testified that she got a new car after the accident, and she recently drove it to an interview with Dr. Kincaid in Hackensack. (*Id*. at. 96-99.)[16]

(3) Plaintiff testified that she had never had surgery before, then admitted to having had reconstructive surgery on her arm. (*Id.* at 88.)

(4) Plaintiff testified that she was unable to move to Los Angeles to continue her employment as a nanny due to the amount of doctor's appointments she had, but

---

[16] In addition, Plaintiff told Dr. Binder in August 2017 that a job she then held in required her to drive. (Ex. 7 at 38 ("Now, she is working and work requirement is to sit in the car for some time . . . .").)

then admitted she had had no doctor's appointments in the six months leading up to her employer's relocation. (*Id.* at 104-05.)

(5) Plaintiff testified that, during her employment at Unclaimed Freight, she asked someone to call her manager at work one day to say that she would be unable to work that day because she was in the hospital, when in fact, she had not been in the hospital. (*Id.* at 121-23.)

(6) Again during her employment at Unclaimed Freight, Plaintiff testified that she was absent for a week due to back surgery, but then admitted that her only back surgeries were two years earlier. (*Id.* at 123-24.)

(7) Plaintiff testified that she had not worked since August 2016, but then admitted that in August 2017, she told Dr. Binder she had a new job. (*Id.* at 125.)

Since the Court finds that Plaintiff is not a credible witness, it discounts her testimony regarding the nature and extent of the injuries she suffered in the subject accident.

**B.**     <u>No Permanent Consequential Limitation Of Use Of A Body Organ Or Member</u>

The "permanent loss of . . . a body function" does not involve the element of significance, but only that of permanence. *Miller v. Miller*, 100 A.D.2d 577, 577 (2d Dep't 1984). To establish a serious injury based on permanent consequential limitation of use of a body organ or member, a plaintiff must "produce competent medical evidence that her injuries are permanent." *Ventra v. United States*, 121 F. Supp. 2d 326, 333 (S.D.N.Y. 2000). Such a claim of permanence "must be supported by medical records and not based solely on plaintiff's testimony and subjective descriptions of pain." *Jones v. United States*, 408 F. Supp. 2d 107, 117 (E.D.N.Y. 2006). "Subjective complaints of pain do not suffice." *Ventra*, 121 F. Supp. 2d at 333.

Plaintiff has not demonstrated a serious injury based on permanency. Plaintiff's case is premised upon the notion that, as a result of the accident, she suffers from "facet pain syndrome" or "facet joint syndrome." (*See, e.g.*, Pl. Findings of Fact & Conclusions of Law, ECF No. 69, at 8; Tr. at 11, 133, 138.) Medical records from Plaintiff's treating physician, Dr. Binder, indicate that the "facet syndrome" conditions he previously had diagnosed had "resolved" by September 2014, about 13 months after the accident. (Ex. 7 at RP 3.) In addition, in January 2018, Dr. Binder confirmed in a medical record that the "facet syndrome" conditions had "resolved." (*Id*. at RP 47.) Dr. Binder's conclusions are consistent with the opinions of Plaintiff's own medical expert, Dr. Aydin, who stated that symptoms such as the ones Plaintiffs suffered would usually resolve within six to twenty-four months. (Tr. at 174-75.) Therefore, Plaintiff's own treating physician and her own expert rebut the notion that her injuries are permanent. Plaintiff has not provided any objective medical evidence and cannot establish that she sustained a permanent consequential limitation to her back, neck or other body organ or member. Thus, the Court finds that Plaintiff has not met her burden of proof.

### C.     No Significant Limitation Of Use Of A Body Function Or System

A "significant limitation of use of a body function does not require permanence, but instead requires a fact finding on the issue of whether the dysfunction is important enough to reach the level of significance." *Jones v. United States*, 408 F. Supp. 2d 107, 119 (E.D.N.Y. 2006) (quoting *Miller v. Miller*, 100 A.D.2d 577, 577 (2d Dep't 1984)). A "minor, mild or slight limitation of use" of a body function or system does not constitute a "significant limitation" under New York law. *Licari v. Elliott*, 57 N.Y.2d 230, 236 (1982). As with a claim based on permanency, claims of serious injuries based on the significance of a plaintiff's limitation must be objectively measured

and supported by credible medical evidence. *See Ventra v. United States*, 121 F. Supp. 2d 326, 333-34 (S.D.N.Y. 2000). "A plaintiff's description of his pain and suffering, standing alone without other objective indicia, cannot support a claim of significant limitation." *Jones*, 408 F.Supp.2d at 119. Additionally, a plaintiff must prove a significant limitation "in both degree and duration." *Gualtieri v. Farina*, 283 F. Supp. 2d 917, 925 (S.D.N.Y. 2003).

The Court finds that Plaintiff has no significant limitation of use of a body function or system. The Court finds the Government's medical expert, Dr. Roth, to be credible. His testimony that Plaintiff only suffered muscle strains is consistent with the diagnosis reached at her very first medical visit, two days after her accident. At that visit on September 15, 2013, the physician diagnosed that Plaintiff suffered a "cervical strain" and "muscle strain." (Ex. 4 at CM 44.)

Even if the Court were to fully accept the testimony from Plaintiff's own medical expert, Dr. Aydin, she cannot show that she sustained a serious injury as defined by the statute. He himself characterized Plaintiff's injury as moderate, not severe, and testified that she can engage in most activities, including climbing stairs, walking, driving, running daily errands and working. (Tr. at 175-76.) He further testified that he primarily relies on subjective evidence from his patients as part of his treatment (Tr. at 139-40), and did not provide any objective evidence that Plaintiff suffered from facet pain syndrome. Plaintiff has not submitted objective evidence that she suffered a significant limitation to her back or left knee. The Court finds that none exists and that Plaintiff has not met her burden of proof.

## IV. Plaintiff Has Not Proven Any Damages Or Economic Loss

Plaintiff claims the following four categories of economic loss: past lost income, future lost income, lost medical and dental benefits, and lost retirement benefits. (JPTO, at 4.) She values her damages at $2.2 million.[17]

In order to recover for lost wages, a plaintiff must show she has endured losses in excess of $50,000, since "basic economic loss" is not recoverable under New York's no-fault law. N.Y. Ins. Law §§ 5102(a), 5104(a). Plaintiff has the burden of proving such damages by a preponderance of credible evidence, and damages must be susceptible of ascertainment in a manner other than speculation. *Battista v. United States*, 889 F. Supp. 716, 724 (S.D.N.Y. 1995). To recover lost future earnings, a plaintiff must establish that she is not capable of any future employment. *Harris v. City of New York*, 2 A.D.3d 782, 784 (2d Dep't 2003) (setting aside jury verdict awarding lost wages where evidence showed that plaintiff, while unable to continue working as police officer due to injury, was capable of other employment); *Senko v. Fonda*, 53 A.D.2d 638, 640 (2d Dep't 1976) (finding that it was error to calculate lost future wages based on complete impairment of earning capacity where plaintiff's "background indicates that he was capable of obtaining . . . nonphysical employment"). Moreover, a plaintiff is required to mitigate lost earnings damages by reasonably seeking vocational rehabilitation. *Bell v. Shopwell, Inc.*, 119 A.D.2d 715, 716-17 (2d Dep't 1986).

---

[17] Although Plaintiff seeks damages of approximately $2.2 million (*see* JPTO, at 4), an action under the FTCA generally may not be instituted for an amount of damages that exceeds the amount of the claim presented to the appropriate federal agency. 28 U.S.C. § 2675(b). Therefore, any recovery by Plaintiff would have been limited to $1 million, the amount of her administrative demand (JPTO, at 6), and which also is the amount demanded in her Complaint. (Compl., ECF No. 8, at 4.)

Plaintiff has not met her burden of demonstrating she is entitled to any lost wages, past or future, because she is and has been employable since the motor vehicle accident and has not shown that she has suffered any diminishment in her earning capacity as a result of the accident. Indeed, Plaintiff resumed and continued to work as a nanny for two years after the accident, earning the same wages that she had been earning prior to the accident, only leaving that employment because her employer moved, not because of any physical limitations resulting from the accident. Moreover, Dr. Kincaid – in testimony that the Court finds credible – testified that Plaintiff is and has been "employable" in a wide range of positions since the accident (Tr. at 318); indeed, Plaintiff's own medical expert, Dr. Aydin, also testified that Plaintiff could work. (Tr. at 176.) Dr. Kincaid further testified that Plaintiff has not lost wages as a result of the accident, because she retained the same access to jobs in her labor market with the same wages and earning capacity that she was earning before the accident. (Tr. at 326.)

Although Plaintiff presented an economic expert at trial, Dr. Richard Wall, the Court declines to credit his testimony, since his testimony is premised upon Plaintiff having been "totally and permanently disabled" (Tr. at 207), which is not the case – even in the view of Plaintiff's own medical expert. Additionally, Dr. Wall conceded upon cross-examination that an individual's economic loss resulting from an accident would be zero, if the individual's ability to earn was not affected by any injury sustained from an accident. (Tr. at 200-01.) Thus, the Court finds that Plaintiff has not met her burden of proving lost wages.

Similarly, Plaintiff has not met her burden of showing that she is entitled to any lost medical, dental or retirement benefits. Just as a claim for lost wages cannot be based on speculation or conjecture, so too an award for lost benefits must be established with reasonable

certainty. *Lamont v. Gondek*, 163 A.D.2d 678, 680 (3d Dep't 1990); *see also Yan Zhao v. United States*, 273 F. Supp. 3d 372, 397 (W.D.N.Y. 2017) (denying a damages award for future medical services after speculative evidence was proffered). Moreover, "a tortfeasor is required only to put the plaintiff 'in the same economic position as he would have occupied had he not been injured.'" *Battista v. United States*, 889 F. Supp. 716, 724 (S.D.N.Y. 1995) (quoting *McCrann v. United States Lines, Inc.*, 803 F.2d 771, 773 (2d Cir. 1986)).

Plaintiff has presented no evidence that she would have been entitled to benefits but for the motor vehicle accident. She did not receive any benefits as part of her employment as a nanny or with Unclaimed Freight. (Tr. at 107.) Further, Plaintiff's economic expert, Dr. Wall, testified that "[o]nly a small percentage of nannies receive fringe benefits, such as health insurance," and that he did not include health insurance or other fringe benefits when performing his economic analysis for Plaintiff. (Tr. at 190, 195.) Because Plaintiff has not met her burden of proof, she is not entitled to recover for economic loss.

## CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiff did not incur a "serious injury" under the relevant provisions of New York Insurance Law. Nor did she prove economic loss or damages. Accordingly, it is hereby ordered that judgment is rendered in favor of the Defendant dismissing the Complaint. It is further ordered that the Clerk of Court close this case.

Dated: New York, New York
      June 1, 2018

**SO ORDERED**.

_____
**STEWART D. AARON**
**United States Magistrate Judge**